IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTOPHER LANTZ, | ) | Case No. 5:20-cv-2817 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER**[1] |
| Defendant. | ) | |

Plaintiff, Christopher Lantz, seeks judicial review of the final decision of the Commissioner of Social Security, denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act.  Lantz challenges the Administrative Law Judge's ("ALJ") negative findings, contending the ALJ erred in his determination of Lantz's residual functional capacity ("RFC") by applying the wrong onset date and failing to resolve a conflict between the vocational expert's ("VE") testimony and criteria in the *Dictionary of Occupational Titles* ("DOT").  But because the ALJ's reference to a pre-amendment onset date was harmless and because the ALJ otherwise applied proper legal standards and reached a decision supported by substantial evidence, the Commissioner's final decision denying Lantz's applications for DIB and SSI must be affirmed.

---

[1] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and the parties consented to my jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  ECF Doc. 12.

## I.      Procedural History

On April 18, 2017, Lantz applied for DIB and SSI.  (Tr. 305, 310).[2]  Lantz alleged that he became disabled on June 16, 2010, due to (i) nerve damage; (ii) arthritis; (iii) carpal tunnel syndrome; (iv) back and neck pain; (v) degenerative disc disease; (vi) high blood pressure; (vii) knee problems; (viii) sleep apnea; (ix) post-traumatic stress disorder; (x) anxiety; (xi) depression; and (xii) bipolar disorder.  (Tr. 305, 310, 339).  The Social Security Administration denied Lantz's claims initially and upon reconsideration.  (Tr. 125-54, 159-78). Lantz requested an administrative hearing.  (Tr. 213).

ALJ Reuben Sheperd initially heard Lantz's case on April 19, 2019, at which Lantz appeared pro se.  (Tr. 105-24).  The ALJ postponed the hearing so that Lantz could obtain representation.  (Tr. 116-17).  The ALJ held a second hearing on October 2, 2019, at which Lantz appeared with counsel and amended his alleged onset date to December 31, 2015.  (Tr. 36-103, 333).  On October 30, 2019, the ALJ issued a written decision denying Lantz's claims.  (Tr. 15-29).  In doing so, the ALJ determined that Lantz had the RFC to perform light work, with the following limitations:

> [Lantz] must be afforded the use of an assistive device for all periods of ambulation; [Lantz] is limited to the occasional use of foot controls, bilaterally; [Lantz] may frequently handle, finger, and operate hand controls with the bilateral upper extremities; [Lantz] may occasionally reach in all directions [including overhead] with the bilateral upper extremities; [Lantz] may frequently kneel and crouch, may occasionally balance, stoop, crawl, climb ramps and stairs, but may never climb ladders, ropes or scaffolds; [Lantz] must avoid all exposure to workplace hazards, including unprotected heights, hazardous machinery and commercial driving; [Lantz] is limited to the performance of simple, routine tasks and the making of no more than simple, work-related decisions, undertaken in a work setting that requires no more than frequent interaction with co-workers, supervisors and the general public, which setting is routine, in that it contemplates few changes in workplace tasks or duties.

---

[2] The administrative transcript appears in ECF Doc. 11.

(Tr. 20-21).

Based on VE testimony that a hypothetical individual with Lantz's age, experience, and RFC could work such available occupations as photocopy machine operator, cashier II, and marker, the ALJ determined that Lantz wasn't disabled.  (Tr. 28-29).  On October 23, 2020, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-3).  On December 22, 2020, Lantz filed a complaint to obtain judicial review.  ECF Doc. 1.

## II.     Evidence

### A.     Personal, Educational, and Vocational Evidence

Lantz was born on December 15, 1974 and was 41 years old on his amended alleged onset date.  (Tr. 305, 310).  Lantz graduated from high school in 1993 and obtained a commercial drivers' license in 2011.  (Tr. 47, 340).  He had prior work as a screen-printing inspector and grocery store manager, which the ALJ determined he could not perform.  (Tr. 27, 48-50, 341).

### B.     Relevant Medical Evidence

#### 1.     Physical Impairments

On April 15, 2009, Lantz underwent an anterior cervical diskectomy and fusion from C5 to C7.  (Tr. 643, 682, 686).  He was discharged the following day in stable condition.  (Tr. 643).  His postoperative diagnosis was cervical spinal canal stenosis at C5 through C7 with a herniated disc at C6-C7.  (Tr. 682).

On November 26, 2011, Lantz was admitted to Summa Health System Akron City Hospital's emergency department following a motorcycle accident.  (Tr. 746, 784).  CT testing showed nondisplaced factures of the zygomatic arch and right maxillary sinus and a

subarachnoid hemorrhage.  (Tr. 746, 784, 799-800, 803-04).  After four days under observation and pain control, Lantz was discharged in "good" condition.  (Tr. 746).

On March 22, 2012, Lantz returned to Summa Health System Akron City Hospital's emergency department, reporting right knee swelling.  (Tr. 820).  Lantz was diagnosed with prepatellar bursitis in the right knee, given an Ace wrap and analgesics, and discharged in stable condition.  *Id.*

On June 23, 2013, Lantz presented to Summa Health System Akron City Hospital's emergency department.  (Tr. 832).  He'd tripped while dancing and fell on his face.  (Tr. 832, 846, 849, 856, 858-60, 865, 869).  Imaging tests showed soft tissue swelling and mild-to-moderate spondylosis at C4-C5.  (Tr. 872).  Lantz was diagnosed with concussion, nasal bone fracture, facial lacerations, face contusion, and neck pain.  (Tr. 834).  He was discharged two days later in stable condition.  *Id.*

On November 30, 2013, Lantz presented to Summa Western Reserve Hospital's emergency department with chest pain and left arm pain and numbness.  (Tr. 1180).  Lantz had fallen on his left side while lying in bed and injured his chest and left arm.  (Tr. 1180, 1187).  Lantz reported he'd had arm pain and numbness since his surgery, but when he rolled over in bed it got suddenly worse.  (Tr. 1180).  Imaging tests of Lantz's chest and neck were unremarkable. *Id.*  Lantz was diagnosed with chest wall pain status post fall and neck pain, and he was discharged in stable condition with pain medication.  *Id.*

On January 8, 2014, Lantz visited Summa Health System Akron City Hospital's emergency department, reporting sudden neck pain and left arm weakness and tingling.  (Tr. 882).  Lantz stated he occasionally had tingling sensations in his right arm and had chronic contractions in both hands.  *Id.*  Lantz reported that his left arm symptoms were new, and he had

4

not experienced similar symptoms since just before his surgery.  *Id.*  Upon physical examination, Lantz had: (i) paraspinal tenderness; (ii) neck midline tenderness; (iii) normal right side and lower extremity strength; (iv) global diffuse left side weakness ranging from 3+ to 4; (v) intact distal pulses; and (vi) decreased ulnar screw distributions C4 to T1 compared.  (Tr. 888).  X-ray testing results were unremarkable.  (Tr. 889).  MRI testing showed mild canal stenosis with possible small paracentral disk on the left at C6-C7.  *Id.*  Lantz was diagnosed with cervical axial pain and left-sided radiculopathy and diffuse weakness.  *Id.*  Lantz was discharged with pain medication and a collar.  *Id.*

On January 15, 2014, Lantz visited Akron General Hospital's emergency department. (Tr. 495).  Lantz stated he'd woken up and felt pins and needles and weakness in his right arm. *Id.*  Lantz was discharged the same day in stable condition with a diagnosis of cervical radiculopathy.  (Tr. 495).

On April 19, 2014, Lantz was admitted to Akron General Hospital's emergency department following a physical altercation.  (Tr. 443, 448-49).  He'd been punched in the face, fell forward, and landed on his chin.  (Tr. 448-49).  Upon physical examination, Lantz had abrasions, an open wound on his chin, and pain and tenderness in the affected areas.  (Tr. 443, 448).  He also had intact sensation, 5/5 strength, full range of motion, and +2/4 reflexes.  (Tr. 448-49)*.*  Imaging tests were largely unremarkable.  (Tr. 475-81).  Lantz was discharged on April 20, 2014 in good condition.  (Tr. 463).

On July 10, 2014, Lantz presented to Akron General Hospital's emergency department with left side numbness and pain.  (Tr. 413).  Lantz had unremarkable physical examination results, except upper extremity tingling and numbness.[3]  (Tr. 414).

---

[3] The remainder of Lantz's July 10, 2014, hospital visit will be discussed in the summary of evidence concerning his mental health.

On August 4, 2014, Lantz visited Summa Health System Akron City Hospital's emergency department, reporting left hand pain. (Tr. 899). Lantz stated his hand pain began when a tree limb from a tree he was cutting hit his hand two weeks before. *Id.* His physical examination results were normal except for tenderness in the first MCP joint. *Id.* He was diagnosed with left thumb sprain and dermatitis and discharged with a splint and analgesia. *Id.*

On August 11, 2014, Lantz returned to Summa Health System Akron City Hospital's emergency department. (Tr. 913). Lantz stated he'd accidentally shot himself in the left forearm while trying to relieve a jam. *Id.* Lantz was discharged with pain medication and a short arm splint. *Id.*

On September 2, 2014, Lantz visited Scott D. Higley, DO, reporting worsening intermittent hand and joint pain. (Tr. 546). Lantz's physical examination results were unremarkable except for muscle spasm in the cervical spine, soft tissue swelling, mild cellulitis, and osteoarthritis. (Tr. 547). Dr. Higley diagnosed Lantz with osteoarthritic exacerbation and prescribed pain medication. (Tr. 548).

On September 22, 2014, Lantz presented to Summa Akron City Hospital's emergency department. (Tr. 929). Lantz reported that he'd dislocated and realigned his ring finger while fishing two weeks earlier but continued to have finger pain. *Id.* His physical examination results were unremarkable except for a small abrasion with erythema. *Id.* The attending physician diagnosed Lantz with left finger pain and early cellulitis. *Id.* Lantz was discharged with a splint and a prescription for clindamycin. *Id.*

On September 24, 2014, Lantz returned to Dr. Higley, reporting left hand pain with decreased mobility, joint instability, joint tenderness, numbness, swelling, and weakness. (Tr.

549).  Dr. Higley assessed Lantz with finger dislocation and prescribed antibiotics, pain medication, and buddy tape.  (Tr. 551-52).

On October 15, 2014, Lantz visited Dr. Higley, reporting hypertension and right shoulder pain.  (Tr. 552).  Lantz had unremarkable physical examination results and was not given a diagnosis for his physical ailments.  (Tr. 554-55).  During an October 22, 2014, follow-up, Lantz reported right elbow pain and Dr. Higley observed swelling.  (Tr. 557, 559).  Dr. Higley diagnosed Lantz with bursitis and administered a bursa injection.  (Tr. 559).

On November 3, 2014, Lantz returned to Dr. Higley, reporting right elbow pain.  (Tr. 561).  Upon physical examination, Lantz had swelling and olecranon bursitis.  (Tr. 563).  Dr. Higley administered another bursa injection.  (Tr. 563).

On November 24, 2014, Lantz presented to Summa Health System Akron City Hospital's emergency department following an assault.  (Tr. 941).  He'd been kicked in the face by several people but could not recall what happened.  *Id.*  Other than facial contusions and ecchymosis, Lantz had unremarkable physical examination results.  *Id.*  A head CT scan gave normal results.  (Tr. 954).  A CT scan of Lantz's spine showed no acute fracture or subluxation, anterior fusion in adequate alignment, and cervical spondylosis.  (Tr. 955-56).  Lantz was discharged with a diagnosis of closed head injury.  (Tr. 941)*.*

Between November 25, 2014 and July 1, 2015, Lantz visited Dr. Higley on a monthly basis.  *See* (Tr. 568-92).  In that time, Lantz reported: (i) arthralgias in his fingers; (ii) neck pain; and (iii) worsening hand pain with decreased mobility, joint instability, joint tenderness, numbness, tingling, and weakness.  (Tr. 571, 574, 577, 582, 585, 588, 592).  His physical examination results were unremarkable, except for muscle spasm, finger numbness, crepitus in his elbow, and severe osteoarthritis.  (Tr. 572, 575, 578, 583-84, 586, 589-90, 593).  Dr. Higley

diagnosed Lantz with osteoarthritis, osteoarthritic exacerbation, and neuropathy.  (Tr. 570, 572, 575, 584, 587, 590, 593).

On July 18, 2015, Lantz presented to Summa Health System Akron City Hospital's emergency department, reporting left hand swelling and pain.  (Tr. 623).  Lantz stated he'd stabbed his hand with a knife to drain the area.  *Id.*  His physical examination results were unremarkable except tenderness to palpation, erythema, and swelling.  *Id.*  Lantz was diagnosed with cellulitis in the left hand and discharged in stable condition.  *Id.*

On July 23, 2015, Lantz returned to Dr. Higley, reporting swelling.  (Tr. 595).  A physical examination revealed an abscess in his left hand, which Dr. Higley drained.  (Tr. 596-97).  Lantz visited Dr. Higley again on August 25, 2015, reporting neck pain.  (Tr. 599).  Lantz's physical examination results were unremarkable and Dr. Higley diagnosed him with osteoarthritis of the elbow.  (Tr. 600-01).

On September 24, 2015, Lantz visited Western Reserve Hospital's emergency department, reporting left eye pain and recurrent headaches.  (Tr. 1144, 1149).  His physical examination results were unremarkable.  (Tr. 1149).  However, the attending physician noted injected conjunctiva.  *Id.*  Lantz was diagnosed with corneal abrasion and chronic recurrent headaches and discharged in stable condition with medication.  *Id.*

On September 28, 2015, Lantz returned to Dr. Higley, reporting worsening elbow pain and eye problems, though his eye was doing "much better" after his hospital visit.  (Tr. 602).  Lantz's physical examination results were unremarkable.  (Tr. 603-04).  Dr. Higley diagnosed Lantz with osteoarthritis of the elbow and corneal abrasion.  (Tr. 604).

On October 3, 2015, Lantz presented to Western Reserve Hospital's emergency department with low back pain after having carried ceiling tiles the day before.  (Tr. 1143).

8

Lantz's physical examination results were unremarkable.  (Tr. 1135-36).  Lantz was diagnosed with lumbosacral strain, prescribed pain medication, and discharged in stable condition.  (Tr. 1137).

On October 7, 2015, Lantz visited Dr. Higley, reporting lower back pain that radiated to his left thigh.  (Tr. 605).  Lantz stated the pain started after lifting a heavy object while at work. *Id.*  Lantz had unremarkable physical examination results except muscle spasm and pain.  (Tr. 606-07).  Dr. Higley diagnosed Lantz with lumbar sprain and post-traumatic osteoarthritis.  (Tr. 607).

On October 20, 2015, Lantz presented to Dr. Higley with neck pain.  (Tr. 609).  Lantz's physical examination results were unremarkable except he had muscle spasm in the cervical spine and severe osteoarthritis in the left hand.  (Tr. 611).  Dr. Higley diagnosed Lantz with neuropathy and "[p]imary osteoarthritis of right hand."  *Id.*

On November 10, 2015, Lantz underwent a nerve conduction and EMG study, the results of which showed bilateral carpal tunnel syndrome.  (Tr. 1130).  The results also showed some chronic right C5-6 denervation.  *Id.*  On November 19, 2015, Lantz returned to Dr. Higley, reporting mild neuropathy in both hands.  (Tr. 613).  His physical examination results were unremarkable, and he was diagnosed with unspecified osteoarthritis.  (Tr. 615).

On July 17, 2016, Lantz presented to the Western Reserve Hospital's emergency department with hand pain with paresthesia and neck pian.  (Tr. 1114).  Lantz stated that his symptoms began three days earlier and had been worsening ever since.  *Id.*  In that time, Lantz worked as a construction laborer putting up a fence.  *Id.*  Lantz's physical examination results were unremarkable except for positive Tinel's and Phalen's sign.  (Tr. 1116-18).  Lantz was diagnosed with carpal tunnel syndrome and chronic cervical pain.  (Tr. 1119).  Lantz was given a

Kenalog injection and wrist splint, prescribed pain medication, referred to an orthopedist, and discharged in stable condition. (Tr. 1118-19).

On August 6, 2016, Lantz visited Western Reserve Hospital's emergency department, reporting that he hit his left foot on a piece of furniture and had not been able to put weight on it since. (Tr. 1082, 1093). X-ray testing showed acute left navicular fracture. (Tr. 1078, 1080, 1086). Lantz was discharged to self-care at home and was given a soft boot cast and crutches. (Tr. 1090, 1260).

On August 9, 2016, Lantz established care with Leroy LeFever, DO. (Tr. 1259). Lantz reported that the use of crutches had caused his carpal tunnel syndrome to flare up. *Id.* He also reported numbness in both hands and that he'd not seen Dr. Higley in over a year due to a lapse in health insurance. (Tr. 1259-60). Lantz had unremarkable physical examination results except bruising in the left foot. (Tr. 1260-61). Dr. LeFever assessed Lantz with elevated blood pressure, carpal tunnel syndrome, and left foot sprain. (Tr. 1259). Dr. LeFever prescribed rest, ice, and over the counter medication for Lantz's sprain and gabapentin for his carpal tunnel syndrome. (Tr. 1259-60).

On September 15, 2016, Lantz visited Richard Limperos, DPM, to check on his foot, which had continued to hurt. (Tr. 1266). After examination, Dr. Limperos diagnosed Lantz with acquired bilateral equinus deformity, bilateral osteoarthritis, left foot pain, hallux rigidus of the left foot, and left navicular fracture. (Tr. 1268). Dr. Limperos administered a Kenalog injection and recommended surgery. *Id.*

On September 23, 2016, Lantz presented to Dr. LeFever for a follow-up, reporting monthly headaches that lasted for three days. (Tr. 1213). Lantz had unremarkable physical examination results except for his left boot. (Tr. 1214). Dr. LeFever diagnosed Lantz with

migraine without aura and status migrainosus, carpal tunnel syndrome, and left foot pain.  (Tr. 1213).  Dr. LeFever prescribed Fioricet for Lantz's headaches and refilled Lantz's gabapentin. *Id.*  On October 5, 2016, Lantz underwent an MPJ fusion and resection of navicular with osteotomy.  (Tr. 1072).

On November 22, 2016, Lantz visited Dr. LeFever for a follow-up, stating it had been hard to open his hands and grip and that his left foot was sore and swollen.  (Tr. 1210).  However, Lantz stated he was doing well post-surgery.  (Tr. 1211).  Lantz had unremarkable physical examination results except for wearing a boot and decreased active range of motion in his hands.  (Tr. 1212).  Dr. LeFever continued Lantz's medication and started him on Ultram to treat his carpal tunnel syndrome.  (Tr. 1210).

On December 5, 2016, Lantz visited Dr. Limperos to follow up on his surgery, stating that he was "[d]oing great" and wanted to return to work.  (Tr. 1276).  X-ray testing showed that Lantz's foot was still healing.  (Tr. 1277-78).  Dr. Limperos prescribed Lantz pain medication and a Medrol dose pack, ordered a new boot, and instructed that he remain off work for another month.  (Tr. 1278).

On December 27, 2016, Lantz returned to Dr. LeFever, reporting he received cortisone injections in his wrists and thumbs, which had improved his symptoms.  (Tr. 1208).  He also noted that since he stopped working, his hands burned less.  *Id.*   Lantz also reported continued migraine pain.  *Id.*  Upon physical examination, Lantz had unremarkable results except tension in the trapezius muscles that caused pain through his head.  *Id.*  Dr. LeFever discontinued Fioricet and prescribed Topamax.  (Tr. 1207).  Dr. LeFever also suggested Botox injections and referred Lantz to a neurologist.  *Id.*

On December 27, 2016, Lantz also went to Western Reserve Hospital's emergency department.  (Tr. 1041).  Lantz reported that he jammed his left first two into the stairs while walking up the steps.  *Id.*  His physical examination results showed swelling in his great toe and tenderness.  (Tr. 1043).  X-ray testing results, however, were unremarkable.  (Tr. 1046).  Lantz was discharged in stable condition with pain medication.  (Tr. 1046-47).

On January 9, 2017, Lantz returned to Dr. Limperos.  (Tr. 1279).  Dr. Limperos reviewed the x-rays taken at the emergency department and noted that the fusion site had displaced two millimeters and shifted "slightly medial."  (Tr. 1281).  Dr. Limperos recommended to Lantz staying on the boot for another four weeks and off work, noting that he may have to revisit the fusion site.  *Id.*

On February 6, 2017, Lantz visited Dr. Limperos for a follow-up, reporting continued foot pain.  (Tr. 1282).  Dr. Limperos prescribed Lantz pain medication, instructed Lantz to remove the boot in four weeks, and stated that he wanted to see how Lantz's pain developed before surgical intervention.  (Tr. 1284).

On March 28, 2017, Lantz presented to Dr. LeFever for a physical exam.  (Tr. 1203, 1205).  Lantz reported continued pain in his foot, relief with cortisone injections for his carpal tunnel syndrome, and relief with Topamax for his migraines.  (Tr. 1205).  Upon physical examination, Lantz had unremarkable results.  (Tr. 1206).  Dr. LeFever assessed Lantz with elevated blood pressure and migraine without aura and status migrainosus.  (Tr. 1203).

On May 10, 2017, Lantz visited Gregory Hill, DO, to discuss surgical options for his left hand.  (Tr. 1309).  Lantz reported constant numbness and tingling.  *Id.*  Lantz stated that his November 2016 cortisone injection provided relief only for a short time and there had been no improvement in his symptoms.  *Id.*  Lantz had unremarkable results upon physical examination

12

except tenderness, painful extension, and reduced neck range of motion.  *Id.*  Dr. Hill diagnosed Lantz with carpal tunnel syndrome and radiculopathy of the cervical region.  (Tr. 1309-10).  Dr. Hill administered Celestone and Marcaine injections and advised Lant that he may have double crush syndrome.  (Tr. 1310).

On June 27, 2017, Lantz returned to Dr. LeFever, reporting that he'd been doing well with his migraine medication.  (Tr. 1317-18).  Dr. LeFever refilled Lantz's medication and prescribed pain medication for Lantz's radiculopathy.  (Tr. 1317-18).

On August 8, 2017, Lantz reported to Dr. LeFever that he could not obtain an MRI of his neck without first doing six weeks of physical therapy.  (Tr. 1320).  He also reported dry skin and left foot pain.  *Id.*  Lantz's physical examination results were unremarkable except for dry, cracking skin on the soles of his feet.  (Tr. 1320-21).  Dr. LeFever instructed Lantz to follow up with Dr. Limperos and suggested Vaseline.  (Tr. 1320).

On August 8, 2017, Lantz also saw Dr. Hill for a follow-up.  (Tr. 1307).  Lantz stated the injections helped for a couple of weeks but his right-hand pain had worsened.  *Id.*  He also had intermittent numbness and tingling and finger joint stiffness.  *Id.*  Upon examination, Lantz had swelling, stiff active range of motion, tenderness, and positive Tinel's and Phalen's sign.  *Id.*  Dr. Hill instructed Lantz to complete physical therapy and obtain an MRI.  (Tr. 1307-08).

On August 24, 2017, Lantz visited Dr. Limperos, reporting left foot swelling.  (Tr. 1351).  Dr. Limperos observed soft tissue swelling of the first MP joint and ankle and assessed Lantz with tendonitis and left ankle instability.  (Tr. 1352).  Dr. Limperos recommended a Medrol dose pack, gave Lantz an ankle brace, and referred Lantz for physical therapy.  *Id.*

On September 19, 2017, Lantz presented to Dr. LeFever, reporting he'd been bitten by a dog on his left ankle.  (Tr. 1325).  Lantz stated that he didn't have trouble working but his left

ankle hurt.  *Id.*  Lantz also requested a new referral for physical therapy because he'd missed two appointments.  *Id.*  Upon physical examination, Lantz had unremarkable results except for left ankle swelling and stitches.  (Tr. 1326).  Dr. LeFever prescribed antibiotics and refilled Lantz's medication, noting that Lantz was doing well with Topamax.  (Tr. 1325-26).

On September 26, 2017, Lantz returned to Dr. LeFever for removal of his stiches.  (Tr. 1322).  Upon examination, Lantz had normal results except a hematoma on his wound.  (Tr. 1323).  Dr. LeFever cleaned out the hematoma and continued Lantz's medication.  (Tr. 1322). On October 4, 2017, Lantz reported to Dr. LeFever that his ankle swelling had resolved but that he'd had no improvement with physical therapy.  (Tr. 1328).

On November 7, 2017, Lantz visited Dr. Hill, reporting pain in his right middle finger into his knuckle and in the thumb area of the left hand.  (Tr. 1305).  He also reported numbness and tingling upon use of or gripping with his hands and that he was unable to finish physical therapy.  (Tr. 1305).  Upon examination, Lantz had pain and swelling in the right index finger MCP joint, diminished grip strength, and painful range of motion but negative Tinel's and Phalen's sign.  *Id.*  Dr. Hill did not prescribe treatment, noting that Lantz was doing well.  *Id.*

On December 8, 2017, Lantz presented to Dr. LeFever for a medication refill.  (Tr. 1330). Lantz stated that he'd seen a neurosurgeon, who did not recommend surgery for his neck.  (Tr. 1331).  Lantz also stated that Dr. Hill administered a steroid injection and planned to perform surgery on his hands.  *Id.*  Upon examination, Lantz had unremarkable results.  *Id.*  Dr. LeFever refilled Lantz's medication and referred Lantz for pain management.  (Tr. 1330-31).

On February 6, 2018, Lantz visited Dr. Hill, reporting that he'd been prescribed Percocet through pain management but that it did not have much effect.  (Tr. 1303).  He still had pain,

14

numbness, and tingling.  *Id.*  His physical examination results were similar to those of his November 7, 2017 visit.  *Id.*  Dr. Hill administered another steroid injection.  (Tr. 1304).

On March 27, 2018, Lantz visited Christopher Heller, DO, to refill his medications.  (Tr. 1333).  Upon physical examination, Lantz had unremarkable results, and Dr. Heller refilled Lantz's medication.  (Tr. 1334-35).

On April 22, 2018, Lantz underwent MRI examination of his cervical spine, which showed impingement without compression of the spinal cord at the C4-5 vertebral joint and minimal bulging without compression at C7-T1.  (Tr. 1298-1301, 1342).

On May 8, 2018, Lantz returned to Dr. Hill for a follow-up, reporting that his injection had helped for about three to four weeks, but his symptoms persisted.  (Tr. 1300).  His physical examination results were similar to his previous two examinations.  *Id.*  Dr. Hill administered another steroid injection and ordered additional x-ray testing.  (Tr. 1301).  Lantz underwent x-ray testing the same day, which showed no evidence of acute fracture or dislocation, reasonably well-maintained joints, no bone erosion, and no significant soft tissue abnormality.  (Tr. 1299, 1311).

On November 28, 2018, Lantz visited Nicole Adkins, CNP, reporting lower back pain that was radiating to his left leg.  (Tr. 1337).  Upon physical examination, Lantz had unremarkable results, except mid lumber paraspinal tenderness with muscle spasm.  (Tr. 1338-39).  Nurse Practitioner Adkins diagnosed Lantz with acute left-sided low back pain with left-sided sciatica and prescribed medication, range of motion exercises, and heat and cold press massage.  (Tr. 1337).

On January 8, 2019, Lantz returned to Dr. Hill, reporting new onset of hand pain.  (Tr. 1296).  Dr. Hill did not, however prescribe or administer any treatment.  (Tr. 1296-97).

15

On March 4, 2019, Lantz visited Dr. Limperos, stating that he'd had daily pain in his right foot since October 2018.  (Tr. 1354, 1356).  X-ray testing showed a fracture and narrowing of the first MP joint with spurring.  (Tr. 1355).  Dr. Limperos dispensed a boot and scheduled a first MP joint fusion.  (Tr. 1356).

On April 17, 2019, Lantz underwent first MP joint fusion of the right foot and removal of a foreign body.  (Tr. 1357).  At an April 25, 2019 follow-up with Dr. Limperos, Lantz reported "doing well" and his pain was "well controlled."  (Tr. 1357).  On May 2 and May 30, 2019, Dr. Limperos dispensed custom foot orthotics and noted that Lantz's foot "looks great."  (Tr. 1362-64).  On June 20, 2019, Lantz reported no new issues and had his orthotics adjusted.  (Tr. 1366-67).

On July 1, 2019, Lantz visited Clayton Seiple, DO, to reestablish care after a lapse in insurance.  (Tr. 1411).  Lantz reported chronic neck pain with a severely limited range of motion.  (Tr. 1414).  He also reported stable radiculopathy in his left shoulder and paresthesia that radiated down to his forearm and fingers.  *Id.*  In the past, gabapentin helped "significantly" to treat his paresthesia.  *Id.*  He also had chronic headaches when his neck pain flared up, which was alleviated by Fioricet.  *Id.*  And Lantz reported chronic knuckle and wrist pain.  *Id.*  Upon physical examination, Lantz had unremarkable results except severely limited neck range of motion and mild tenderness of the cervical spine.  (Tr. 1414-15).

On July 11, 2019, Lantz returned to Dr. Limperos, reporting that he'd felt a pop in his right foot a week before.  (Tr. 1425).  X-ray testing showed no broken hardware at the surgical site but there was a subtle dorsal fracture.  (Tr. 1426).  Dr. Limperos instructed Lantz to avoid work and use a boot for six weeks.  *Id.*

On August 8, 2019, Lantz visited Dr. Heller, reporting right foot pain following his foot surgery and that he was unable to get an appointment with Dr. Limperos. (Tr. 1408). Upon examination, Lantz had right foot pain with motion and swelling in the foot, ankle, and knee. (Tr. 1409). X-ray testing gave unremarkable results except right foot edema. *Id.* Dr. Heller assessed Lantz with acute right knee pain, cellulitis in the right knee and foot, and right foot pain. *It.* Dr. Heller prescribed medication and administered an injection of ceftriaxone. (Tr. 1409-10).

On August 19, 2019, Lantz visited Dr. Limperos, reporting right foot swelling and pain. (Tr. 1428). New x-rays showed that Lantz's fracture was healing. (Tr. 1430). However, Dr. Limperos believed that Lantz's pain symptoms were because of gout and diagnosed him with acute lead-induced gout involving the right toe. (Tr. 1430-31). Dr. Limperos prescribed a Medrol dose pack, uric acid, and continued use of the boot. (Tr. 1430).

On September 12, 2019, Lantz visited Dr. Limperos, reporting bilateral foot pain, swelling in his right foot, popping ankles upon weightbearing, and that his ankle was giving out. (Tr. 1431). Dr. Limperos encased Lantz's right foot in a cast, prescribed Mobic for arthritic and foot pain, prescribed Percocet, and instructed Lantz to continue to use the boot for another month. (Tr. 1433). On September 19, 2019, Lantz reported to Dr. Limperos that the pain medication helped. (Tr. 1434). Dr. Limperos replaced Lantz's cast and continued Mobic. (Tr. 1436).

### 2.    Mental Impairments

On November 14, 2010, Lantz was brought to Summa Health System Saint Thomas Hospital's emergency department by police after Lantz had told his family that he wanted to kill himself. (Tr. 705, 725). Lantz denied any such intentions, sating he spoke out of anger. (Tr. 705). Lantz was discharged on November 17, 2010 in stable condition and with diagnoses of

major depressive disorder, recurrent, severe without psychosis and alcohol dependence with physiological dependence.  (Tr. 706).

On June 25, 2014, Lantz presented to Summa Western Reserve Hospital's emergency department with depression and aches and pains.  (Tr. 1167).  He stated that he drank all day, every day, and was very depressed.  *Id.*  Lantz was diagnosed with depression without suicidal ideation, informed about available substance abuse and mental health services, and discharged in stable condition.  (Tr. 1167-68).

On July 10, 2014, Lantz was intoxicated and mentioned to the attending physicians at Akron General Hospital's emergency department that he had depressive symptoms and suicidal ideations, for which he was admitted to the psychiatric unit and placed on alcohol withdrawal. (Tr. 415, 418, 423-24).  During his stay in the hospital, Lantz was treated with Cymbalta and Neurontin.  (Tr. 427).  He was discharged in improved condition on July 14, 2014, with diagnoses of depressive disorder, not otherwise specified, and alcohol dependence.  *Id.*  His last mental status exam showed unremarkable results, except for depressed moot.  (Tr. 425).

Following his discharge, Lantz participated in a chemical dependence treatment program. (Tr. 425, 429).  After two treatment sessions, Lantz did not return and was discharged from the program on August 11, 2014.  (Tr. 541-42, 544).

On October 15, 2014, Lantz presented to Dr. Higley with insomnia and depression.  (Tr. 552).  Lantz reported difficulty concentrating and maintaining sleep, fatigue, irritability, anxiety, loss of appetite, and racing thoughts.  *Id.*  His mental status exam results were "normal."  (Tr. 555).  However, Dr. Higley diagnosed Lantz with bipolar 1 disorder and prescribed Lamictal, Cymbalta, and zolpidem.  *Id.*  During his October 22, 2014 follow-up, Lantz reported improvement but nevertheless had depressed mood, excessive worry, and irritability.  (Tr. 557).

18

On March 17, 2015, Lantz was brought to Akron General Hospital's emergency department for alcohol intoxication and making homicidal threats to his neighbor.  (Tr. 400-01).  Lantz was discharged in stable condition with instructions to follow-up with an alcohol abuse treatment program.  (Tr. 402, 405).

On April 21, 2015, Lantz began a substance abuse treatment program for alcohol and cocaine dependence, which he successfully completed on August 15, 2015.  (Tr. 530-33).  Meanwhile, Lantz started attending individual counseling sessions with Kimberly Bonnett, PC.  (Tr. 1240).  Lantz attended two sessions with Counselor Bonnett, one on June 12 and one on July 22, 2015, at which he reported continued sobriety.  (Tr. 1241-42, 1244-45).  His mental status examination results at each session were unremarkable.  (Tr. 1240-41, 1243-44).

On August 25, 2015, Lantz visited Dr. Higley, reporting depression and anxious/fearful thoughts.  (Tr. 599).  His mental status exam was unremarkable.  (Tr. 600).  Dr. Higley diagnosed Lantz with bipolar 1 disorder and continued medication treatment.  (Tr. 601).

On August 9, 2016, Lantz visited Dr. LeFever, reporting anxiety and insomnia.  (Tr. 1260).  However, Lantz stated his anxiety was "controlled … without medication except at night."  (Tr. 1259).  Dr. LeFever prescribed melatonin for Lantz's insomnia and nothing for his anxiety.  *Id.*  During his August 23, 2016, follow-up, Lantz stated that his anxiety under control, but melatonin was ineffective for his insomnia.  (Tr. 1257).  Dr. LeFever started Lantz on Ambien.  (Tr. 1256).

On September 23, 2016, Lantz reported to Dr. LeFever that he felt the Ambien was helping and that his anxiety was still under control.  (Tr. 1254).  Dr. LeFever continued Lantz's medication for insomnia.  (Tr. 1253).

On November 22, 2016, Lantz visited Dr. LeFever for a follow-up, reporting that his anxiety had worsened. (Tr. 1251). Lantz reported stress related to losing his job, worsening financial condition, and energy changes. *Id.* Dr. LeFever prescribed trazodone to treat Lantz's insomnia and anxiety. (Tr. 1250-51).

On December 27, 2016, Lantz reported to Dr. LeFever that he got anxious while waiting in line to donate plasma, with palpitations and rapid pulse. (Tr. 1248). Otherwise, he reported that Ambien was working well. *Id.* Dr. LeFever refilled Lantz's insomnia medication, noting that Lantz's anxiety was "[s]table." (Tr. 1247).

On March 28, 2017, Lantz returned to Dr. LeFever, reporting that his anxiety was "[d]oing well" and had "[n]o issues." (Tr. 1206). Dr. LeFever refilled his medication, noting his anxiety was still stable. (Tr. 1203-04).

On April 25, 2017, Lantz returned to Counselor Bonnett. (Tr. 1238). In his intake form, Lantz reported that he'd been homeless and living with a friend since he lost his job in August 2016. (Tr. 1223, 1225). Lantz indicated that he was actively looking for work and did not have performance or behavioral problems that affected his work. (Tr. 1225). He also reported his drug history, in which he stated he last used cocaine in 2006. (Tr. 1228). Lantz further reported depressed mood and anxiety, stating that he didn't want to do anything, could not do what he used to, spent a lot of time in his head, and didn't go fishing or out as much. (Tr. 1230). He also reported: "I hate being around people out in public. Just not having money. That gets me anxious." *Id.* However, on mental status examination, Lantz had unremarkable results. (Tr. 1234). Counselor Bonnett diagnosed Lantz with unspecified depressive and alcohol-related disorder. (Tr. 1237).

On May 4, 2017, Lantz had his first counseling session with Counselor Bonnett.  (Tr. 1386).  On mental status examination, he had unremarkable results except anxious mood and avoidant eye contact.  (Tr. 1386-87).  Lantz reported anxiety being around people and depression from being unable to work.  *Id.*  He also reported isolating, racing thoughts, and feelings of sadness, frustration, and guilt.  (Tr. 1387).  Lantz stated he was unable to do his outdoor activities because of his physical limitations.  (Tr. 1388).

Lantz attended a second counseling session on May 12, 2017.  (Tr. 1390).  His mental examination results were identical to his previous session.  (Tr. 1390-91).

On June 27, 2017, Lantz reported no mental health complaints to Dr. LeFever.  (Tr. 1318).  Dr. LeFever refilled Lantz's medication, noting that Lantz's insomnia was stable, and his anxiety was doing well.  (Tr. 1317).

On September 19, 2017, Lantz returned to Dr. LeFever, who advised Lantz to start a long-term anxiety medication.  Lantz stated that, "he would like something for his anxiety."  (Tr. 1325).  Lantz stated that he'd been taking Celexa and lamotrigine but did not like the side effects.  *Id.*  Dr. LeFever prescribed Ativan and Wellbutrin.  (Tr. 1324-25).  During his October 4, 2017 follow-up, Lantz reported that he was doing well on Wellbutrin.  (Tr. 1327).  And on December 8, 2017, Dr. LeFever noted that Lantz's anxiety and depression were "stable."  (Tr. 1330).

On July 1, 2019, Lantz reported to Dr. Seiple that his anxiety had been worsening since he'd been off medication.  (Tr. 1414).  Lantz stated that his mood was much better controlled while on medication.  *Id.*  His mental status exam was unremarkable.  (Tr. 1415).  Dr. Seiple diagnosed Lantz with anxiety and depression and prescribed Lamictal.  (Tr. 1411).

### C. Relevant Testimonial Evidence

Because the issues Lantz raises in this action do not implicate his testimony, it is unnecessary to summarize his statements at the ALJ hearing.

The ALJ asked Bruce Holderead, a VE, to assume a hypothetical person with Lantz's age, education, and work experience but limited to: (i) light work; (ii) occasional use of foot controls; (iii) frequent use of hand controls, handling, and fingering; (iv) occasional climbing of ramps/stairs but never ladders/ropes/scaffolds; (v) frequent kneeling or crouching; (vi) occasional balancing, stooping, or crawling; (vii) no exposure to unprotected heights, moving mechanical parts, or commercial driving; (viii) simple, routine tasks; (ix) simple, work-related decisions; (x) frequent interactions with supervisors, coworkers, or the general public; and (xi) few changes in routine.  (Tr. 92-93).  The VE testified such an individual could work as a cashier, sales attendant, and marker, all of which were SVP 2.  (Tr. 93).

The VE testified that if the hypothetical were further limited to occasional left arm reaching and use of an assistive device, the hypothetical individual could still perform work as a cashier, marker, and photocopy machine operator, all of which were SVP 2.  (Tr. 94-95).  The VE testified that if the individual were limited to sedentary work or was off task 20% of the time, the individual could not perform any work.  (Tr. 95-96).  The VE testified that his testimony was consistent with the DOT.  (Tr. 96).

Upon questioning by Lantz's counsel, the VE testified that under the DOT, a position's reasoning level was distinct from the SVP level, which referred to the amount of time it took to learn a job.  (Tr. 98).  The VE also testified that the ALJ's hypothetical limiting the individual to simple and routine work would exclude the ability to carry out detailed instructions.  *Id.*

III.    **Law & Analysis**

A.    **Standard of Review**

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  And, even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'" *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quoting *Jones*, 336 F.3d at 477); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (Substantial evidence "means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'").  But, even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").  And the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked.").

## B.    Step Four

Lantz argues that the ALJ failed to apply proper legal standards or reach a decision supported by substantial evidence in making his RFC findings.  ECF Doc. 13 at 10-12.  Lantz argues that the ALJ wrongly based his RFC findings on evidence from before Lantz's amended onset date and gave inadequate attention to post-onset-date evidence.  ECF Doc. 13 at 10-13.  Specifically, Lantz argues that the ALJ failed to consider evidence documenting pain, weakness, tenderness, numbness/tingling, decreased pulse sensation, decreased upper extremity range of motion, positive Tinel's sign tests, and wrist swelling.  ECF Doc. 13 at 12.  He argues the ALJ failed to mention mental status exams noting depression, anxiety, difficulty concentrating, and occasional suicidal ideations.  Id.  The failure to mention this evidence, Lantz argues, constitutes a failure to build an accurate and logical bridge between the evidence and the final result and, by extension, a lack of substantial evidence supporting the ALJ's decision.  Id.  Lantz also argues that the ALJ misconstrued his "testimony" by stating that he was "cocaine dependent."  ECF Doc. 13 at 10 (citing Tr. 23).  And Lantz argues that his intermittent, sporadic activities of daily living and part-time work did not equal the ability to engage in sustained work.  ECF Doc. 13 at 10-11.

The Commissioner responds that the ALJ's reference to the wrong onset date was harmless because the ALJ considered evidence during the period under adjudication.  ECF Doc. 15 at 10.  The Commissioner argues that the evidence upon which the ALJ based his decision was substantial, and the ALJ did not err by not explicitly discussing every piece of evidence in the record.  ECF Doc. 15 at 11.  The Commissioner argues that the ALJ did not misstate the record or rely solely on Lantz's activities of daily living to support his RFC findings.  ECF Doc. 15 at 12-13.

At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. § 404.1520(e).[4]  The RFC is an assessment of a claimant's ability to do work despite his impairments.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)).  "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 1996 SSR LEXIS 5, at *14.  Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant.  20 C.F.R. § 404.1529(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5, at *13-14.

Lantz is correct that the ALJ only referenced the pre-amendment onset date (June 16, 2010) in his decision and that the ALJ considered evidence dating nearly that far back.  (Tr. 15, 21-22, 24, 34).  But the misstatement of the alleged onset date is not reversible error unless Lantz can show he was prejudiced as a result.  *Trickey v. Colvin*, No. 1:13-cv-00124, 2014 U.S. Dist. LEXIS 95965, at *24 (M.D. Tenn. July 15, 2014) (collecting cases).  He has not made that showing.  The ALJ cited and extensively discussed medical evidence from the period under adjudication.  (Tr. 18-26).  And as will be discussed below, the ALJ's decision otherwise complied with the regulations and was supported by substantial evidence.  *See Trickey*, No. 1:13-cv-00124, 2014 U.S. Dist. LEXIS 95965, at *24-25.

The ALJ complied with the regulations by: (i) assessing Lantz's RFC in light of the medical evidence, his testimony, and other evidence in the record; and (ii) clearly explaining that he rejected Lantz's subjective symptom complaints because his statements regarding the

---

[4] Although this case concerns both DIB and SSI benefits, the regulations that govern them are generally identical to one another; thus, we cite only to the regulations governing DIB applications.  *Compare* 20 C.F.R. § 404.1501 *et seq.*, *with* 20 C.F.R. § 416.901 *et seq.*

intensity, persistence, and limiting effects of his physical and mental impairments were not consistent with the medical evidence.  20 C.F.R. § 404.1520(e); SSR 16-3p, 2016 SSR LEXIS 4, at *3-4, 11-12, 15; SSR 96-8p, 1996 SSR LEXIS 5, at *13-15; (Tr. 21-25).  And the ALJ's impairment-by-impairment discussion of the medical and nonmedical evidence included findings that were inconsistent with Lantz's stated limitations.  The ALJ's discussion was sufficient to allow this court to discern how the ALJ evaluated Lantz's subjective symptom complaints.  SSR 16-3p, 2016 SSR LEXIS 4 at *26.

The ALJ found that Lantz's description of his foot pain was inconsistent with: (i) unremarkable x-ray test results dated August 8, 2019 (Tr. 1408, 1422); (ii) February 6, 2017 x-ray test results showing anatomic alignment of the great toe, hardware in place, remediated hallux valgus, and mild arthritic changes (Tr. 1038); (iii) Lantz's statement to Dr. Limperos in December 2016 that he was doing well and ready to return to work (Tr. 1276); (iv) Dr. Seiple's July 1, 2019 treatment note, indicating that Lantz was no longer using chronic pain medication (Tr. 1411); and (v) physical examination results through September 19, 2019 indicating normal range of motion, strength, sensory function, and capillary refill (Tr. 1277, 1355, 1435).  (Tr. 22).

The ALJ found that Lantz's description of his neck pain was inconsistent with: (i) MRI testing results dated April 22, 2018, showing unremarkable post-operative changes an no significant canal stenosis (Tr. 1298-99, 1342); and (ii) clinical examinations through August 8, 2019 showing normal range of motion, sensory function, and coordination (Tr. 401, 628, 1409). (Tr. 22).  The ALJ found that Lantz's description of his carpal tunnel syndrome was inconsistent with: (i) effective treatment with steroid injections (Tr. 1205, 1297) and (ii) physical examination results through July 1, 2019 showing normal range of motion, no focal motor or sensory defects, normal strength and grip, and negative Tinel's signs (Tr. 401, 1298, 1415).  (Tr. 23).

As for Lantz's mental health impairments, the ALJ found that: (i) Lantz's prior substance abuse was not at issue since the record showed no relapses; and (ii) mental health examination results through May 12, 2017 were unremarkable (Tr. 538, 731-32, 1390-91).  (Tr. 29).[5]  And the ALJ found that Lantz's activities of daily living were inconsistent with the alleged severity of his symptoms, such as: (i) dancing; (ii) painting baseboards; (iii) moving furniture; (iv) playing soccer; (v) riding a dirt bike; (vi) hiking; (vii) fishing; (viii) hunting frogs with his son; (ix) engaging in part-time work in construction; (x) cutting trees; and (ix) installing fences.  (Tr. 30 (citing Tr. 330-32, 413, 417, 504, 746, 820, 832, 899, 1114, 1157, 1276, 1408)).

Lantz's remaining arguments are unavailing.  Although the ALJ's discussion of his RFC findings included pre-onset date evidence, the ALJ could permissibly do so.  *See DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x 411, 414 (6th Cir. 2006) ("We do not endorse the position that all evidence or medical records predating the alleged date of the onset of disability … are necessarily irrelevant or automatically barred from consideration[.]").  Lantz's challenge to the ALJ's evaluation of his activities of daily living implies that the ALJ solely relied on his activities of daily living to render his decision.  But that's not what the ALJ did.  The ALJ considered Lantz's activities of daily living as one among several factors bearing on his decision.  And the ALJ's reference to Lantz's cocaine dependence was not based on his testimony.  Cocaine dependence was listed as a diagnosis in Lantz's substance abuse program records and

---

[5] The ALJ also cited Lantz's inconsistent use of chronic pain medication to treat his back pain carpal tunnel syndrome and the lack of medication treatment and formal therapy for his mental health impairments.  (Tr. 22-24).  However, the ALJ didn't consider Lantz's reasons for not consistently taking pain medication or attending therapy, which the ALJ was required to do.  SSR 16-3p, 2016 SSR LEXIS 4 at *23.  But because the ALJ's other reasons for discounting Lantz's subjective symptom complaints of her neck pain could independently support his RFC finding, the error is harmless.  *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009).

his last known use was listed in his *post-onset* date treatment notes from Counselor Bonnett, both of which the ALJ cited.  (Tr. 23 (citing Tr. 530, 1228)).

Lantz cites physical and mental status examinations he claims the ALJ ignored by not expressly discussing them in his opinion.  ECF Doc. 13 at 12.  A review of the ALJ's decision, however, indicates that the ALJ based his decision upon an extensive review of the record, including objective examination notes, treatment records, imaging test results, and medical opinions.  20 C.F.R. § 404.1529(a); SSR 96-8p 1996 SSR LEXIS 5; (Tr. 18-25).  That the ALJ did not discuss every single record is not evidence that he failed to consider them.  *Dykes v. ex rel. Brymer v. Barnhart*, 112 F. App'x 463, 467 (6th Cir. 2004) ("[A]n ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered." (quotation marks omitted)); *see also Day v. Comm'r of Soc. Sec.*, No. 1:16-cv-2813, 2017 U.S. Dist. LEXIS 208434, at *37 (N.D. Ohio Dec. 5, 2017) ("[T]here is no requirement[] that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record.").  A common-sense reading of the ALJ's decision shows that the ALJ determined that the evidence cited in his decision supported a conclusion that the longitudinal record weighed in favor of his ultimate RFC finding.  *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009) (stating that cherry-picking arguments can just as easily be described as weighing the evidence); *Solembrino v. Astrue*, No. 1:10-cv-01017, 2011 U.S. Dist. LEXIS 58231, at *25 (N.D. Ohio May 27, 2011) ("[A]n ALJ does not 'cherry pick' the evidence by merely resolving some inconsistencies unfavorably to a claimant's position.").  And, moreover, Lantz has not shown how the allegedly omitted evidence contradicted the ALJ's RFC findings.

Although the ALJ applied the wrong onset date in analyzing Lantz's claim, the error was harmless.  *Trickey*, No. 1:13-cv-00124, 2014 U.S. Dist. LEXIS 95965, at *24-25.  The ALJ gave sufficiently clear reasons to support his RFC findings.  And the evidence the ALJ discussed *was* substantial because it supported the ALJ's conclusions that Lantz's limitations were not so limiting as to be disabling, even if Lantz can point to evidence that arguably supports a contrary conclusion.  *O'Brien*, 891 F. App'x at 416.  Thus, Lantz has not established a basis for remand on account of any claimed ALJ error in assessing the RFC.

### C.     VE Testimony

Lantz argues that the ALJ failed to resolve an inconsistency between the criteria in the DOT and the VE's testimony.  ECF Doc. 13 at 13-15; ECF Doc. 17 at 1-3.  Specifically, Lantz argues that the VE's testimony that his answer to the ALJ's second hypothetical would preclude carrying out detailed written and oral instructions was inconsistent with the jobs he testified the hypothetical person could perform.  ECF Doc. 13 at 13.  He argues those jobs required a reasoning level of 2, which required the ability to carry out detailed written and oral instructions and only reasoning level 1 jobs required one-to-two step tasks.  ECF Doc. 13 at 13-14.

The Commissioner argues there was no conflict; if there was the ALJ didn't have to address it because Lantz didn't identify any conflict at the ALJ hearing; and the ALJ could properly consider the VE's testimony because the VE testified that any variances between the DOT and his testimony were based on his experience and training.  ECF Doc. 15 at 13-16.

At the final step of the sequential analysis, the burden shifts to the Commissioner to produce evidence as to whether the claimant can perform a significant number of jobs in the national economy.  *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir. 2002); 20 C.F.R. §§ 404.1520(a)(4)(v).  An ALJ may determine that a claimant has the ability to adjust to other

work in the national economy by relying on a VE's testimony that the claimant has the ability to perform specific jobs.  *Howard*, 276 F.3d at 238.  However, an ALJ cannot rely on VE testimony that is "based on underlying assumptions or definitions that are inconsistent with . . . regulatory policies or definitions."  SSR 00-4p, 2000 SSR LEXIS 8 at *4 (Dec. 4, 2000).  If the VE's testimony appears to conflict with the DOT, the ALJ must: (1) "obtain a reasonable explanation for the conflict;" and, before relying on the VE's testimony, (2) resolve the conflict and explain in the decision how the conflict was resolved.  *Id.*

The ALJ applied proper legal standards in determining that there were a significant number of jobs in the national economy that Lantz could perform.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  The ALJ asked the VE whether his testimony in response to the hypotheticals was consistent with the DOT, and the VE testified that it was.  (Tr. 96).  In the Sixth Circuit, that was enough to discharge his duty under SSR 00-4p to inquire into any inconsistencies with the DOT.  *E.g.*, *Staymate v. Comm'r of Soc. Sec.*, 681 F. App'x 462, 468 (6th Cir. 2017); *Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 715 (6th Cir. 2013); *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 858 (6th Cir. 2010).  The ALJ had no obligation to investigate further.  *Beinlich v. Comm' of Soc. Sec.*, 345 F. App'x 163, 168 (6th Cir. 2009).

The burden, then, was on Lantz to raise any discrepancies in the VE's testimony during the ALJ hearing.  *Id.*  Lantz didn't meet that burden.  He elicited testimony that the DOT and SVP levels were different and that simple, routine work would preclude the ability to carry out detailed written and oral instructions.  (Tr. 97-98).  But that wasn't enough to raise a "direct and *obvious*" conflict that the ALJ needed to clarify.  *Cavanaugh v. Saul*, No. 20-10034, 2021 U.S. Dist. LEXIS 59556, at *26 (E.D. Mich. Mar. 5, 2021) (emphasis in original) (quotation marks omitted).  This court has previously held that "a claimant's limitation to simple one-or-two step

30

instructions and simple routine tasks was not inconsistent with the ability to perform jobs with the requirement of Reasoning Level 2." *Poll v. Berryhill*, No. 3:16CV2061, 2017 U.S. Dist. LEXIS 139903, at *21 (N.D. Ohio Aug. 30, 2017).  And "there is no precedent within the Sixth Circuit that requires the Commissioner to align DOT reasoning levels with RFC classifications." *Hahn v. Comm'r of Soc. Sec.*, No. 3:17 CV 897, 2018 U.S. Dist. LEXIS 161050, at *31 (N.D. Ohio Sept. 20, 2018) (quotation marks omitted).  Thus, the court finds that the ALJ applied proper legal standards and that the ALJ reasonably relied on the VE's testimony to satisfy his burden at Step Five.  *Howard*, 276 F.3d at 238; *see also, e.g.*, *Vega v. Comm'r of Soc. Sec.*, No. 1:20-CV-01934, 2021 U.S. Dist. LEXIS 243173, at *20-21(N.D. Ohio Dec. 3, 2021) (concluding on similar facts that it would have been unreasonable to conclude a possible discrepancy was apparent when the VE testified that a limitation to simple, routine tasks precluded jobs requiring the ability to carry out detailed written and oral instructions); *Hahn*, No. 3:17 CV 897, 2018 U.S. Dist. LEXIS 161050, at *31-32 (concluding there was no apparent conflict between jobs requiring Reasoning Level 2 and a limitation to simple instructions).

## IV.    Conclusion

Because the ALJ's error in determining Lantz's RFC based on the wrong onset date was harmless and because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, the Commissioner's final decision denying Lantz's applications for DIB and SSI is affirmed.

**IT IS SO ORDERED.**

Dated: January 10, 2022

Thomas M. Parker
United States Magistrate Judge